Retrieval you're wondering one. Okay, Miss mind. Good morning, your honors. I am assistant appellate defender, Rachel Moran, and I represent Robert Nelson. May it please the court. Your honors, it is undisputed that Robert Nelson suffers severely from Tourette syndrome and obsessive compulsive disorder. Both Nelson and his treating psychiatrist testified at trial that his actions in dialing a stranger's phone number and saying offensive things were an involuntary tick and that he did not intend to harass, abuse, or offend. The trial court explicitly accepted this unrebutted testimony as true, but faulted Nelson for failing to take medication that might have controlled the ticks. This court should reverse Mr. Nelson's convictions for two reasons. First, the state failed to prove that he acted voluntarily. And second, even if he did commit a voluntary act, the state failed to prove that he made the calls with the requisite specific intent to harass, abuse, or offend. How do we define requisite specific intent? Your honor, a specific intent is an intent to achieve the result. In other words, to achieve the consequences of the action, not simply to engage in the behavior. And the result in this case was he must intend to harass, offend, or abuse. The second district has defined a specific intent to harass as an intent to produce emotional distress akin to that of a threat. I think that's the closest an Illinois court has ever come to defining specific intent in terms of the telephone harassment statute. That's People v. Taylor cited in the opening brief. So the admissions of knowledge that the effect of what he did is not relevant. Exactly, your honor. And that's where the trial court erred here. The court said, essentially, you knew this could happen, and therefore, I find you irresponsible. You can't use this condition as an excuse. But the mental state isn't knowledge. The mental state is a specific intent to cause this behavior, not simply a knowledge that the consequences could result from his behavior. And your argument is that there are no facts and circumstances that would allow the state to establish that intent. Exactly, your honor. And in fact, even the state in its brief only points to a circumstantial inference of intent that it says the trial court could have reasonably drawn from Mrs. Miller's testimony. But the problem is Mrs. Miller, of course, she couldn't testify as to what Mr. Nelson intended. It is true that courts sometimes look at the circumstances. But here, there's such strong evidence rebutting that that would be the intent. Well, absent a confession or admission by the perpetrator, what do you have? Your honor, in some cases, courts- I mean, what does the state have? I mean, what is there to establish that? Well, here, the state has nothing. Well, that's your claim. But I'm just saying, you were just saying there were some circumstances that you could make an inference from. Your honor, I think what, broadly speaking, in some cases, certainly this court and other courts have said that a trial court can look to an inference of intent based on circumstantial evidence because it's rare to have a specific admission of intent. But here, this case is analogous to, or very similar to, People v. Chmielenko, in which the first district court said that where you have a possible inference of intent, but it's strongly rebutted by the testimony of the defendant, and in this case, the expert, which was lacking in Chmielenko, then it's not reasonable to draw that inference. So in some cases, perhaps the court could draw the inference of intent based on circumstantial evidence alone. And we're certainly not asking this court to depart from that long line of precedent. What we're saying is, in this case, it's not a reasonable inference based on the unrebutted and explicitly accepted testimony by the trial court. Isn't that line of reasoning, though, that you can infer specific intent from circumstances? Isn't that kind of emasculated, to some extent, the whole specific intent principle? Your Honor, it would be less appropriate to use that reasoning in a specific intent case versus a general intent case. So yes, I think I agree with Your Honor on that point, that it's even less appropriate to draw that inference here, where the mental state is above that of simply a general intent case. And the trial court's factual findings on this point are critical to this court's review. And what the trial court said is, I do have to accept it, and by it, he's referencing the fact that the testimony that this was a tick in involuntary behavior. I do have to accept it because it came from the expert. I don't have any expert from the state saying this isn't part of a complex tick. So it's very clear what the trial court believed as far as the credibility findings he made. He made them in favor of the defense testimony. And then he went on to say, he knew his symptoms were being treated. You have no excuse for not continuing the treatment. And that speaks to Your Honor's point as to whether the court was improperly applying a knowledge standard, which is too low for the specific intent requirement here. But it also speaks to the fact that there was no voluntary act here, because failure to take medication is not a voluntary act. Not doing something is not an act. And a person can be liable for failing for an omissioned act under the Voluntary Act statute only if he has a legal duty to perform that act. Mr. Nelson, it's undisputed he did not have a legal duty to take the medication. Should he have? Of course. Was it perhaps even reckless for him not to take the medication? That's possible. But that's not the question before this court. The question is, did he have a legal duty to take the medication? And absolutely not. Well, we also had testimony from the psychiatrist, if I'm remembering correctly, that it was not an intentional failure to take the medicine, that he thought that he had run out and had not been able to get a hold of the doctor. So that's the only thing that I can recall from the testimony that said anything about why he wasn't taking the medicine. And that suggests that it was not intentionally not taking it. Your Honor's recollection is perfect. That is the only thing we have here in this record, is that the state cross-examined the doctor. And Dr. Fields testified, I believe he ran out of medication and was unable to get to me. And Dr. Fields was an hour away. It's not unreasonable to suggest that it would have been difficult to get that medication. And the state argues on appeal now, well, that was speculation. They didn't make that objection at trial. And it's not speculation for a doctor to testify. I believe that's what happened. And that is, as Your Honor just pointed out, it's the only evidence as to why he stopped taking the medication. There's no indication that it was done on purpose. And really, if you think about the alternate. Nobody thought to ask that question to the defendant, apparently. Why did you stop taking it? Yes, the state did not take that, did not ask that question. He didn't testify about that at all, just the psychiatrist who did, in fact, speculate that that might have been. It's true. It was speculation, I suppose. No, Your Honor, I don't think it was speculation, because he was essentially hedging his bets. He didn't want to avow to something in court. But he did say, Mr. Nelson told me that that was what happened, that he had run out of medication. So I don't think it's speculation. I suppose him being unwilling to swear under oath that that's absolutely what happened. But the ultimate outcome of the state's reasoning is that Mr. Nelson somehow intentionally went off his medication and created all these disastrous physical symptoms for himself just so that the results could occur and that someone would be harassed. And really, it's a little bit absurd to say that he would have done that on purpose so that he would have caused that result. And even if he did, people versus Jones out of the First District, if it is instructive on that point, it says that the person must have the specific intent at the time the calls are made. And so even in accepting the state's somewhat preposterous reasoning, that would be assigning an intent to him sometime about a month earlier, before the calls were made, not when the calls were made. At the time the calls were made, the unrebutted testimony is he did not have control over his behavior. And this was entirely involuntary. Are there other charges? I should ask the prosecutor's office. Are there other charges that could be brought that don't require specific intent? Absolutely, Your Honor. And the state could have perhaps, setting aside the voluntariness issue, but if the court found that he was acting voluntarily, perhaps disorderly conduct would have been an appropriate charge, which just requires that a person do and act in such a manner as to alarm or disturb someone and cause a breach of the peace. That may have been, if this court found he was acting voluntarily, that may have been an appropriate charge to bring, or even a reckless conduct charge, requiring some lesser mental state. But what they did is charge him with the highest thing they could, and they could not meet the elements of that offense, specific intent to correct. Was he medicated during the trial? Yes, Your Honor. He was on some medication. It's not entirely clear what, but Dr. Fields, he was back to being, he was in the Whiteside County Jail at that point, but the jail was taking him to Dr. Fields periodically so that he could receive medication and be prescribed. So yes, he was on some medication, and it's very clear from the record, he was still ticking to a great deal. Hopefully not as much as he would have without the medication, but it's very apparent that he was, the ticks were not controllable. That wasn't something that the medication would stop altogether. And that corroborates exactly what Dr. Fields and Mr. Nelson testified. Yes, it helps. It controls it to some extent, but it doesn't eliminate the ticking behavior. Thank you. Thank you so much, Ms. Moran and Mr. Arano. May it please the Court, Good Morning, Your Honors. Good Morning. This case is about choices. Choices that are made, one can make choices that are right choices, or the wrong choices. In this case, Mr. Nelson made wrong choices on several occasions. His first call was on March 27th of 2010. Second was on April 11th, 2010, and the third and fourth calls were on April 26th of 2010. He had over 30 days in which to inform his conduct to the requirements of the law, but he chose not to do so. He claimed, while the only evidence in the record is that he ran out of his medication, for 30 days he must have been out of his medication, for 30 days he chose not to contact Dr. Fields, for 30 days he chose to instead hold within, he says he's unable to conform his conduct. He said, I hold it in as long as I can. That says that he has some control over it, so why does not he choose to contact his doctor and say, hey doctor, I need my prescription refilled. He doesn't have to go an hour away to do that. He doesn't have to go to see another doctor to get his prescription filled, he just has to ask for the prescription to be filled at his local pharmacy as anyone else who has had their doctor refill a prescription has done. How does that even go to this charge? It goes to the charges because it shows that he had no intention of controlling his behavior, and that goes to the specific intent. Well, it goes to both the voluntariness of his conduct and to his specific intent to harass, or intent to offend the victim. This 84-year-old young woman who is a victim of multiple calls with not simple tics, and I realize the testimony was that you can have extended tics, if you will, with offensive conduct. But it goes to what his mental state was when he made these calls. Could he, under people versus grant, when a person claims that their conduct is not voluntary, the person must be in a state of automatism or seizure and lacks volition to control or prevent his conduct. He could have prevented his conduct. The testimony was that he could prevent his conduct if he took his medication. In fact, Dr. Field said that when he was on his medication, he had almost gotten to the point where he could live a normal, quote-unquote, life. Now, if he goes off his medication for 30 days and makes repeated calls, that shows that he does not intend to fulfill that, that he has volitional control to whether or not he can make those phone calls. He looked up, I'm sorry. Assuming that we agree with your argument, how does that show the specific intent to commit the crime? It shows the specific intent because he knew that he was going to, if we assume that he knew that he's gonna make these phone calls and make these offensive statements, and he knew he could have stopped them, it shows that the reasonable inference from the evidence of his conduct, not his statements, but his conduct, is that he intended the result, he intended to offend her by not controlling his conduct. It seems to me that you've made a big leap there because if he knew that if he didn't take his medication, he might have some lapse and his Tourette's would come into play, did he know that it was going to take the specific form of making the calls to Mrs. Miller and saying the things that he did? Which are annoying, but I don't know that they're anything more than that. Well, having a calling in the, he didn't necessarily know her age at the first call. He knew it because even if you accept that on March 27th, he did not have control. On April 11th, on April 26th, he certainly had knowledge that that was what he did, done in the past, and that's what he was doing then. So there is not, there is, I don't know. He had knowledge he was making the phone call. Correct. But what is the specific intent of this particular charge? The specific intent is to offend Mrs. Miller. Right, it's not the specific intent to make a phone call. No, that goes to the voluntariness of his action. Okay, okay. Did he look up Mrs. Miller's phone number? Yes. Did he pick up the telephone? Yes. Was he in control of his body at that particular time? Yes. Did he dial that number? Yes, he did. He dialed that on multiple occasions. On the last day, the 26th, he called, said something offensive, he immediately hangs up, and he immediately calls back again. This is dialing, not this strange, I mean, an automatic state, I can't control it. So why is it the intent? That's really the key, I think, in this case. Does he have the intent to offend her? I, we, assert that he does, because he knew that what he was gonna say was offensive. You knew that? Well, he says that he knew that saying, calling a woman up and saying he's pulling one off. Did he know that when he made the call, I guess is the question, not afterwards or not? Well, certainly he would've known what he was saying. But that's not enough for this charge, just know that what words you choose are offensive. The intent is to... To offend. Right. I guess I'm not necessarily explaining myself clearly enough. It's difficult, it's difficult. When he, let's step away from, if he doesn't have these tics, picks up the phone, makes these calls, that's clearly going to be a problem. He cannot say, I didn't know, oh, I didn't know this was gonna be offensive. If that's what his testimony is, do we have to believe him on that? Mr. Aranda, don't you have a fundamental problem in that you have no evidence? The state did not present any evidence. To support the argument that you're making. The trial judge made the decision based on the only evidence that was presented in court. And you didn't, you, the state, didn't present a contrary witness. And the state said, I have no, I mean, the court said, I have no choice. This is the only evidence before me. You're now making an argument as though you had a witness that had presented evidence of the argument that you're trying to make. Well, Mrs. Miller testified that she was offended. Mr. Nelson testified it was offensive. Okay, but we're talking about Mr. Nelson's specific intent. Well, and that brings us to the diminished capacity argument. In Hewlett, the court recognized that a defendant cannot claim he has a diminished capacity, which is a mental disease or defect that doesn't allow him to be insane, but allows him to be unable to form the specific intent for a crime. The court said that he could not backdoor that argument by saying it is a reasonable, by making a reasonable doubt argument. That's what the defendant in this case is doing. He's saying that he couldn't form the specific intent to offend Ms. Miller because he had this threats and obsessive compulsive disorder that prevented him from being able to form that specific intent. He can't raise that as a defense. He can't raise that as a defense in a reasonable doubt argument. That's what he's doing in this case. And therefore, you have to reject it. There is, the reasonable inference is, Justice Holdren's use brought to infer conduct by the actions of the defendant. We must, we are asserting that his intent is inferred from his conduct, both the fact that he did not take his medication that would have controlled and prevented him. Therefore, he must have wanted to do these things. And this court, if it says that defendant is able to assert this as a defense, he is going to get a free pass and say, well, guess what, I can call up any old lady I want and make whatever offensive statements I want and blame it on my Tourette's. And the only thing I'm going to get is a disorderly conduct charge, not a felony charge. And Mr. Nelson is not a, I'm sorry. But if you take that in a world view, you step back and say, well, this is the only way to shut him up or stop his conduct. Just put him in jail for six years, 10 years, whatever. And I mean, is that a reason to decide this case, to affirm this case? I mean, is it, or do we go to the facts of the case? I mean, I understand your argument, and it's very seductive, you know, that how the heck are we going to stop this guy from doing it if we don't send him away? Well, and it's significant. The court did not go into, and it was not raised as specific evidence, but the charge, the indictment in this case, says this was his third, more than third time doing this. So Mr. Nelson has a history and will continue to do so. It's like any other recidivist, you know. This pattern of conduct, we get to put the individual away for longer amounts of time. What happened to the other cases? We don't know. Unfortunately, there's no- One of them, I thought, I read that one of them was, was found not guilty or was dismissed or something. Well- I mean, I may be thinking- And I don't recall that specifically. And as I say, it wasn't brought up. I've been trying the case, which I don't do, but, you know, obviously, up there were some excellent other crimes that I've been in, but, you know, that's not here, not there. What we have to go by, though, is what we know of what Mr. Nelson's conduct was. He did have access to a doctor. He did have access to calling up that doctor. He said, the reason I didn't call up was because I was embarrassed. So for 30 days, he chose, he chose again, instead of calling his doctor and controlling his behavior, he chose to make a choice, a specific choice, to not do so. And from that, we can infer his specific intent. He must have been doing this, so he could go ahead and make these calls in a feminist way. I believe that's everything else. What's our standard of review? Ian, this is reasonable doubt, therefore, in like most favorable prosecution, any rational trier of fact would find the elements of the court, the charges, must find and must affirm. So it's a common standard. The opposing counsel says the rationale for the decision by the trial judge was a knowing, not specific intent. Well, the trial judge, if you know, I put in the record, from the records, he recognized that he was raising a diminished capacity defense. He said, well, you know, you're raising this as if, you know, anybody that gets a volunteer, he analogized it to intoxication, which, you know, it's not a strict law of the property. Well, not necessarily if it's like battery. He mentioned domestic battery in addition to DOI. That was, so I think they kind of cross over that one. He raises up if he meets his wife then, or something like that. So it's, so there are specific intent crimes that there could be related to. Analogized to? Analogized to. And diminished capacity is defense to specific intent crimes. And again, it is not a recognized defense in Illinois. And I've cited the case that says that. So, and that's what they're doing here. It's backdooring the diminished capacity. But a disorderly would have been easier to prosecute. Well. But it's a lot of what, class A? Yeah, it's just a misdemeanor, and he's not gonna spend any. So just three years, 64 days instead of six years. Sure. Yeah, and you're gonna do that every time he does this, and he clearly has a pattern of doing this. Well, he was incarcerated for 300, for him to sentence him for 313 days. And why is that kind of jail? So, that gets expensive for the county, doesn't it? Well. Certainly, well, it's expensive for the state to hold him in the penitentiary, too. County board doesn't. Well, it doesn't care about that, yeah. For the portable reasons we asked, this court affirmed. Thank you, Your Honor. Okay, Mr. Rado, thank you very much. And Ms. Moran, any rebuttal? Briefly, Your Honors. May it please the court, I have two points. I'd first like to respond to the state's contention that we are backdooring a diminished capacity defense. And second, I'd like to respond to the state's contention that this court would be giving Mr. Nelson a, quote, free pass. As to the diminished capacity defense, it's not a defense in Illinois, and it's not what trial counsel raised here or what we are raising on appeal. In People v. Hewlett, which is the only case the state cites for diminished capacity, the court said that a diminished capacity defense applies when a defendant is, quote, incapable of forming the requisite intent. Mr. Nelson has never argued that he's not capable of forming the intent to harass, offend, or abuse. He's arguing that he did not have that specific intent when he engaged in this behavior. This is not a diminished capacity defense. The defendant in Hewlett was arguing, was attempting to present an expert who would have testified that because of the defendant's postpartum depression, she was incapable of intending to murder her child. That's a general intent crime anyway, not specific intent. But the testimony would have been that she was incapable of having this mental state because of her postpartum depression. Never has Mr. Nelson suggested that he or people with Tourette's in general cannot form the intent to harass someone. He is saying that he did not have the intent and the state failed to present evidence that he had that intent when he engaged in this behavior. So it's an insufficiency of evidence issue. Absolutely, Your Honor. It is not a diminished capacity defense. As to the state's argument that this court should not give Mr. Nelson a free pass, this speaks to the state's theme of choices. The state is the party that had choices in this case. They could have, as Justice Holdredge noted, they could have chosen to charge him with a lesser offense. They also, and this is very important to their claim that he is a nuisance to the community and that something needs to be done, they could have petitioned to have him civilly involuntarily admitted on an inpatient or an outpatient basis. And that's provided for in the mental health code. If a person presents a reasonable threat of danger to society or is refusing to adhere to prescribed treatment and is reasonably expected to suffer deterioration as a result of his refusal, the state can file a civil petition to have him involuntarily admitted. If, for example, that on an outpatient basis, that would simply be a court order requiring him to take the medication. And that would also solve the state's problem as to voluntariness. If he actually had a legal duty to take medication, the state might actually have an argument that he acted voluntarily in this case. They didn't do that. So it's the state that has made all the wrong choices in this case and has chosen to charge a man based on evidence they simply cannot satisfy the burden. How long has he been incarcerated? He received a six-year sentence. Pardon me? With his county time included, how long has he been? Well, he's out now. He's serving his MSR right now. The length this case took to get to trial, it's actually more than 313 days, Your Honor, because the motion for new trial and the state's reference to the court's single statement, when a person takes alcohol, he has diminished capacity, that happened 14 months after trial. So it's not at all appropriate to say that that's what the court was thinking when the court imposed the conviction. 14 months later, the court made a passing reference that a person who ingests alcohol has a diminished capacity. Court never said that's what Mr. Nelson's defense was. But to return to the original question, it was 313 days, I believe, before he was tried. And then he was held another 14 months before he was sentenced. In the county jail? In the county jail. I believe so, Your Honor. I believe he was still in the county jail this entire time. I'm not positive, but I believe so. He since served a brief stint in IDOC. Yes, because he'd been good for three years when he entered. Couldn't quite eat it all up in the county. Exactly, Your Honor. He served a brief stint in IDOC and was released in April, has been on MSR since April. All right. Any other questions? Thank you, Your Honors. Thank you, Ms. Moran. Thank you both for your argument today. We will take this matter under advisement, get back to you with a written disposition within a short day. And we'll take a short recess for panel discussion.